UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

JAMES GRANT,

                         Plaintiffs,

   -against-

THE CITY OF NEW YORK, a municipal entity; WILLIAM J. BRATTON (former New York City Police Department Police Commissioner), in his individual capacity; and LAWRENCE BYRNE (former New York City Police Department Deputy Commissioner of Legal Matters), in his individual capacity,

                         Defendants.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Case No. 19-cv-4334

------------------------------------------------------------------------ X

Plaintiff JAMES GRANT, by and through his attorneys, Bernstein Clarke & Moskovitz PLLC and Scott A. Korenbaum, Esq., alleges as follows:

**PRELIMINARY STATEMENT**

1. Before he was wrongfully forced out of the New York City Police Department in May 2016, James Grant was a highly-respected executive and the Commanding Officer of the 19th Precinct. When a federal investigation uncovered a sweeping corruption scandal that implicated high-ranking officials in the NYPD and other offices of the City of New York, former Police Commissioner William J. Bratton and Deputy Commissioner of Legal Matters Lawrence Byrne took steps to effectively scapegoat Mr. Grant and other innocent NYPD executives.

2. After a trial in the Southern District of New York confirmed that Mr. Grant was innocent, a jury acquitted him of all charges. According to news accounts, two of the jurors said that Mr. Grant never should have been charged. One juror said that the only benefit the months-long trial proved Mr. Grant received was a doll for his daughter as a Christmas gift. That juror

described Mr. Grant as a "pawn," and he said it was clear from the evidence that other high-ranking officials were actually involved in corrupt activities. He identified Philip Banks, the former Chief of Department and second in command of the NYPD, and several other high-ranking officers, who he said should have been charged instead of Mr. Grant. The trial testimony also implicated several officials, including Commissioner Bratton, in a scheme involving bribes for gun licenses.

3. Unlike those officials, Mr. Grant and other innocent officers were forced out of the Department without due process. Mr. Grant and these other officers were forced by Commissioner Bratton and Deputy Commissioner Byrne to retire immediately, under threat of a pre-determined departmental "trial" that would result in termination no matter what. Meanwhile, Banks and Michael Endall (the Commanding Officer of the License Division), and other high-ranking officials who were outed during the federal trial for having taken part in corrupt activities, were allowed to keep their jobs for months or years and retire without repercussion.

4. Commissioner Bratton and Deputy Commissioner Byrne forced Mr. Grant to give up significant accrued overtime and unused vacation and lose out on increased pension and other retirement benefits. Mr. Grant brings this civil rights action to seek restitution for the unlawful deprivation of his hard-earned time – which included more than two years of unpaid overtime – accrued over a nearly twenty-year career dedicated to the Police Department.

## JURISDICTION AND VENUE

5. This action is based on 42 U.S.C. § 1983 for violations of plaintiff's due process rights secured by the Fourteenth Amendment to the United States Constitution.

6. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7. Venue is proper pursuant to 28 U.S.C. § 1391 in the Southern District, where most of the events giving rise to this action took place.

**JURY DEMAND**

8. Plaintiff demands a trial by jury in this action.

**THE PARTIES**

9. Plaintiff JAMES GRANT is a citizen of the United States and of the State of New York.

10. Defendant THE CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York. Defendant City of New York is a municipal corporation organized pursuant to the laws of the State of New York. It has all the powers vested in it by the laws of the State of New York, the City of New York and the Charter of the City of New York. At all times relevant herein, it was the employer of the individually named defendants.

11. The City is authorized by law to maintain a police department and does maintain the New York City Police Department. The Department acts as the City's agent and the City assumes the risks incidental to the maintenance of a police department and the employment of police officers.

12. Defendant WILLIAM J. BRATTON was, at all times relevant to this Complaint, the NYPD Police Commissioner. He is sued in his individual capacity.

13. Defendant LAWRENCE BYRNE was, at all times relevant to this Complaint, the NYPD Deputy Commissioner of Legal Matters. He is sued in his individual capacity.

14. At all times relevant to this Complaint, defendants Bratton and Byrne were high-level officials in the City of New York, and their actions and decisions constituted policy for the City.

15. Upon information and belief, at all relevant times, the individual defendants were and are citizens of the United States and the State of New York.

16. At all relevant times, the individual defendants were employed by the City and acted under color of law in the course and scope of their duties and authority as officers, agents, servants, and employees of the NYPD and the City.

17. At all relevant times, the individual defendants violated clearly established rights under the Fourteenth Amendment to the United States Constitution of which reasonable law enforcement officers in their respective circumstances would have known.

## STATEMENT OF FACTS

### I. James Grant's career in the NYPD

18. Mr. Grant began working for the NYPD in July 1996.

19. Throughout his career, Mr. Grant was an exemplary employee. He consistently received performance evaluations above or well-above standards. The NYPD acknowledged Mr. Grant's exemplary performance with numerous awards, honors and recognitions.

20. Throughout his career, the NYPD promoted Mr. Grant to Sergeant, Lieutenant, Captain, and Deputy Inspector.

21. In 2016, Mr. Grant held the position of Deputy Inspector and was the Commanding Officer of the 19th Precinct, one of the most prestigious and coveted assignments in the NYPD.

22. At all relevant times, Mr. Grant was a member in good standing of the NYPD.

## II.     The terms of Mr. Grant's employment

23. As a Deputy Inspector, Mr. Grant was represented by the Captains Endowment Association in collective bargaining negotiations with the City.

24. In 2016, a collective bargaining agreement existed between the City and the CEA, which set forth terms that applied to Mr. Grant as a Deputy Inspector.

25. Deputy Inspector is a rank above Captain that the Police Commissioner has discretion to designate, as well as rescind.

26. As an employee of the City of New York, Mr. Grant enjoyed protections set forth in the New York Civil Service Law and the Rules of the City of New York.

27. Collectively, the terms of the collective bargaining agreement, the New York Civil Service Law, and the Rules of the City of New York that governed Mr. Grant's employment relationship with the City/NYPD are referred to in this Complaint as "the terms of employment."

28. One of the terms of Mr. Grant's employment was that the NYPD could only terminate him for cause after providing him notice of the allegations, an opportunity to take discovery, and a fair hearing.

29. Although the Commissioner had the discretion to demote Mr. Grant from a Deputy Inspector to a Captain, he could not terminate Mr. Grant's employment without following the applicable rules set forth in the terms of employment.

30. These terms of employment created a protected property interest in Mr. Grant's continued employment with the NYPD.

31. Therefore, due process entitled Mr. Grant to fair process *before* he could be terminated.

32. Another term of employment that applied to Mr. Grant was that he was obligated to work overtime when necessary and could only use vacation time when permitted.

33. The demands of the Department that were placed on Mr. Grant throughout his career meant that he had accrued substantial unpaid overtime and unused vacation time. When Mr. Grant was forced out of the Department in May 2016, he had accrued approximately 83 days of unused vacation and 4,490 hours of unpaid overtime, also known as "compensatory time."

34. A standard practice that is permitted within the NYPD for officers of every rank is that prior to their effective retirement date, they are permitted to "run" their accrued vacation days and compensatory time.

35. While accrued vacation and compensatory time is "run," an officer receives a regular salary – including raises that may go into effect – and accrues service credit and pension contributions.

36. Significant pension and retirement benefits are made available to NYPD officers who retire with twenty years of service credit.

**III.   Defendants deprived Mr. Grant of due process**

37. In 2015-2016, the FBI was investigating whether high-level NYPD officials had engaged in corrupt activities on behalf of two businessmen, Jeremy Reichberg and Jona Rechnitz, who had ties to Mayor Bill de Blasio and the Correction Officers Union President Norman Seabrook.

38. Eventually, the investigation led to Chief of Department Philip Banks and other high-ranking officials.

39. In the course of its investigation, the FBI interviewed dozens of NYPD officials, including Mr. Grant, as well as other City officials and civilians.

40. When FBI agents interviewed Mr. Grant on February 25, 2016, they told him that he was not a target nor a subject of their investigation. They just wanted to ask questions about Mr. Reichberg, whom Mr. Grant had known for many years as a friend. Mr. Grant had not engaged in illegal or corrupt activities with Mr. Reichberg.

41. When Mr. Grant met with the United States Attorney's Office the following month, there was no indication that he was the subject or target of any pending prosecution.

42. On April 7, 2016, Mr. Grant received a call from the CEA President, Roy Richter, who said that the NYPD was going to modify and transfer Mr. Grant. Mr. Richter said the reason he was given was that news articles had come out about the FBI's investigation of corruption in the NYPD's highest ranks and, in sum and substance, Police Commissioner Bratton had to take some action due to the optics of the news articles.

43. There was no indication that Mr. Grant would be charged with any offense or was accused of violating Department rules.

44. On May 13, 2016, Mr. Richter met with Mr. Grant again. Mr. Richter said that he was told Mr. Grant would be interviewed by IAB the following week and suspended following that interview. Mr. Richter also said that Commissioner Bratton had told him that if Mr. Grant went to a department trial and contested those charges, it did not matter what the outcome was, Commissioner Bratton was going to terminate Mr. Grant.

45. On May 20, 2016, Mr. Richter called Mr. Grant and said that Deputy Commissioner of Legal Matters Lawrence Byrne had told him that Mr. Grant would be demoted and terminated unless he retired immediately, which necessarily meant having to waive all of his accrued vacation days and compensatory time.

46.	According to Mr. Richter, Deputy Commissioner Byrne did not provide any details on what evidence the Department or what charges the Department intended to pursue against Mr. Grant.

47.	Mr. Grant was aware that the Police Commissioner had the unilateral authority to demote him from the position of Deputy Inspector to Captain and the ultimate authority to terminate his employment. A demotion and termination would have significantly impacted Mr. Grant's pension benefits.

48.	Left with no choice, Mr. Grant submitted his forced resignation, which became effective on or about June 21 or 22, 2016 – less than a month shy of Mr. Grant attaining twenty years of service credit.

## IV.	The federal trial

49.	After Mr. Grant was forced out of the Department he was charged with accepting bribes in exchange for providing access to police resources.

50.	When a member of the Department is charged criminally, whether by way of complaint or indictment, it is the practice, if not the policy, of the Department not to pursue actively disciplinary charges until the criminal prosecution is concluded. In fact, the Department's Internal Affairs Bureau routinely stays an investigation pending a determination by the prosecutor's office whether it will go forward with a prosecution.

51.	In 2018, Mr. Grant went to trial in the Southern District of New York.

52.	The jury heard months of testimony and evidence, and unanimously found that Mr. Grant was not guilty of any criminal wrongdoing.

53.	In fact, according to news accounts, two of the jurors said after the trial that Mr. Grant never should have been charged.

54. That juror described Mr. Grant as a "pawn," and he said it was clear from the evidence that other high-ranking officials – including Philip Banks, the former Chief of Department – were actually involved in corrupt activities.

55. The trial testimony implicated several other high-ranking officials, including Commissioner Bratton, in a scheme involving the NYPD License Division, which was run by Deputy Inspector Michael Endall, whereby gun licenses were provided in exchange for bribes.

56. One juror said that the only gift prosecutors proved Mr. Grant had received was a doll for his daughter as a Christmas gift.

57. Despite the clear evidence of wrongdoing by Deputy Inspector Endall, the Police Department had allowed him to remain on the job for an additional ten months before he retired after departmental charges were lodged against him.

58. In short, the trial revealed with clarity that Mr. Grant and other innocent executives had been scapegoated while high-ranking NYPD officials who had actually engaged in corrupt activity were allowed to skate.

**V.    The union arbitration**

59. In August 2016, the CEA filed a grievance on behalf of five other NYPD officers, but not Mr. Grant. These officers, like Mr. Grant, were forced out by the Police Commissioner in the wake of the corruption scandal. They, like Mr. Grant, had committed no crime nor taken part in any corrupt activity.

60. After taking evidence and hearing testimony, an impartial arbitrator concluded that the NYPD had deprived these officers of due process and had improperly forced them to resign and waive their accrued unused vacation and compensatory time.

61. CEA President Richter testified during the proceedings that on May 20, 2016, Deputy Commissioner Byrne told Mr. Richter that the Police Department intended to offer these officers the choice of retiring immediately, being demoted immediately, or facing charges that would result in their termination. Deputy Commissioner Byrne did not tell Mr. Richter what misconduct these officers had committed that led the Department to issue this ultimatum.

62. According to the arbitrator, Mr. Richter "inferred from his discussions with Deputy Commissioner Byrne that the Commissioner had been persuaded to act by the appearance of names in the newspaper and the Commissioner's concern for his legacy."

63. Mr. Richter was initially told that these officers would be permitted to run their accrued leave and compensatory time in keeping with the standard Police Department practices. Later, Deputy Commissioner Byrne told Mr. Richter that these officers had to waive the substantial amounts of accrual they had accumulated during their service – that is, the Department wanted them off the books because they had accumulated "too much time."

64. The arbitrator concluded that "Byrne's discussions with Union President Richter are binding on the City." The arbitrator also found the following:

> Particularly telling was the concession of the City's witness, [Deputy Commissioner of Labor Relations John Beirne] that Byrne had initially asked him if the Department could legally compel the grievants to retire. When Byrne received a negative response, the facts establish that Byrne engaged in a course of action designed to force them out by threatening to have a hearing which would culminate in their certain termination. These threats, in my view, comprised a breach of the grievants' statutory and due process rights to a hearing based on the evidence which Byrne steadfastly and consistently refused to outline in even a general way. Richter testified that Byrne instead told him that if the grievants did not agree to retire they would face demotion and termination after the preference of charges.

65. Additionally, the arbitrator found that:

> Byrne's communications with the grievants' Union was clearly designed to convince the grievants that insistence on their due process rights would be futile

10

as dismissal with its severe economic consequences was certain, regardless of the facts. By stressing that the Commissioner wanted their resignations without sharing any facts or allowing any of the grievants to present a defense informally, Byrne was able to emphasize the Commissioner's power rather than the justification for the imposition of discipline. Taken together with the lawful exercise of the Commissioner's right to demote them, substantially reducing the value of their termination pay and eliminating their right to "run their time", the threat to deprive grievants of their due process right to an truly impartial hearing on the merits magnified the grievants' duress.

66. These findings and conclusions apply equally to Mr. Grant. When Deputy Commissioner Byrne spoke with Mr. Richter and told him that Mr. Grant would be demoted and terminated if he did not retire immediately, Mr. Grant had not been indicted and had no reason to believe he would become the subject of a baseless criminal prosecution. Indeed, when he was questioned by the FBI, he was told that he was not the subject nor a target of their investigation.

## VI. Damages

67. In May 2016, Mr. Grant had accrued approximately 83 days of unused vacation and 4,490 hours of accrued compensatory time.

68. At all times relevant to this Complaint, the standard practice in the NYPD was to permit officers to "run" their accrued time before their retirement becomes effective.

69. As the arbitrator explained:

> A retiring officer is motivated to remain on payroll and draw down accruals in order to maximize service time and earn a more generous pension. In addition, the officer, may qualify for negotiated wage increases which may accrue to bargaining unit members while they remain on active payroll. Wage increases may also enhance pension entitlement. Any substantial waiver of leave and compensatory time accruals diminishes an officer's pension entitlement, including for service time for twenty or more years, terminal leave and annuity savings. It was undisputed that the accrual waivers made by the grievants herein far exceeded those customarily elected by retiring officers.

70. In Mr. Grant's case, his accrued vacation and compensatory time would have amounted to approximately two-and-a-half years of credit before his effective retirement date.

Had Mr. Mr. Grant been allowed, consistent with standard practice, to run his accrued time, he would have been paid his full salary for more than two-and-a-half years; he would have received the benefit of any raises that went into effect during that time; and he would have received pension contributions and accrued service credit that would have greatly increased his pension and other retirement benefits.

71. When his forced retirement became effective in June 2016, Mr. Grant was less than a month shy of twenty years' service credit.

72. Had Mr. Grant had been permitted to use his accrued time before retiring – as is the standard practice in the NYPD – he would have retired with more than twenty years' service credit and significantly increased retirement and pension benefits.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Against the Individual Defendants

73. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

74. In committing the acts and omissions complained of herein, the individual defendants acted under color of state law, individually and in concert, and deprived plaintiff of substantial property without first affording him fair process, in violation of the right to due process protected by the Fourteenth Amendment to the United States Constitution.

75. As a direct and proximate result of the individual defendants' violation of the plaintiff's constitutional rights, plaintiff suffered the injuries and damages set forth above.

76. The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 Against the City of New York

77. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

78. The City of New York is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for the actions and decisions of the individual defendants, taken in the course of their duties as high-level policymaking officials of the City of New York.

79. In committing the acts and omissions complained of herein, the City deprived plaintiff of substantial property without first affording him fair process, in violation of the right to due process protected by the Fourteenth Amendment to the United States Constitution.

80. As a direct and proximate result of the City's violation of the plaintiff's constitutional rights, plaintiff suffered the injuries and damages set forth above.

### DEMAND FOR RELIEF

**WHEREFORE**, plaintiff demands the following relief against the defendants, jointly and severally:

(a) compensatory damages in an amount to be determined at trial;

(b) punitive damages from the individual defendants to the extent allowable by law;

(c) attorneys' fees;

(d) the costs and disbursements of this action;

(e) pre-judgment interest; and

(f) such other and further relief as is just and proper.

Dated: New York, New York
May 13, 2019

BERNSTEIN CLARKE & MOSKOVITZ PLLC
11 Park Place, Suite 914
New York, New York 10007
(212) 321-0087
moskovitz@gmail.com

By: _____
    Joshua S. Moskovitz

SCOTT A. KORENBAUM, ESQ.
11 Park Place, Suite 914
New York, New York 10007
(212) 587-0018
scott@korenbaumlaw.com

By: /s/ _____
    Scott A. Korenbaum